UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RUDY GALLARDO, | § | |
| | § | |
| Plaintiff, | § | Cv. No. SA:12-CV-00130-DAE |
| | § | |
| vs. | § | |
| | § | |
| SUN LIFE ASSURANCE | § | |
| COMPANY OF CANADA, | § | |
| | § | |
| Defendant. | § | |

ORDER: (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT; (2) DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT

On May 31, 2013, the Court heard oral argument on the

cross-Motions for Summary Judgment filed by Plaintiff Rudy Gallardo and

Defendant Sun Life Assurance Company of Canada.  George E. Mauze II, Esq.,

appeared on behalf of Plaintiff.  Eric Mathisen, Esq., appeared on behalf of

Defendant.  After carefully considering the memoranda in support of and in

opposition to the Motions, and in light of the parties' arguments at the hearing, the

Court, for the reasons that follow, **GRANTS** Defendant's Motion for Summary

Judgment (doc. # 30) and **DENIES** Plaintiff's Motion for Summary Judgment

(doc. # 31).

1

BACKGROUND

Plaintiff Rudy Gallardo worked as a purchasing manager for Labatt Food Service, LLC ("Labatt") for approximately twenty-seven years, from 1984 to 2011.  (First Amended Complaint ("FAC") ¶ 5.)  His duties included overseeing purchases of products for distribution, determining inventory levels by item, ensuring accurate product costs, developing relationships with product manufacturers, negotiating pricing, managing purchasing staff, and traveling regularly to visit manufacturers and for trade shows and industry conferences.  (CF[1] at 364.)  Labatt paid premiums to Defendant Sun Life Assurance Company ("Sun Life") for a long-term disability insurance policy (the "Policy") for its employees in managerial positions.  (FAC ¶ 12.)  Plaintiff, who was employed by Labatt in a managerial capacity, is a beneficiary of the Policy.  (Id. ¶ 13.)

I.      Overview of the Policy

The Policy lists as Eligible Classes "[a]ll full-time Executives, Senior Managers, Managers and Sales Representatives working a minimum of 30 hours per week."  (Doc. # 30-24 ("Policy") at 4.)  An insured's coverage ceases on the earliest of several dates, including (1) the date that he is no longer in an Eligible Class, (1) the date his employment terminates, and (3) the date when he ceases to

---

[1] CF refers to the Claim File that was before Sun Life at the time that it made its determination regarding Plaintiff's application for benefits.  It is attached to Defendant's Motion for Summary Judgment (doc. # 30).

be Actively at Work.  (Id. at 10.)  The Policy considers an insured to be "Actively at Work" when he "performs all the regular duties of his job for a full work day . . . ."  (Id. at 6.)

    A.  Total Disability Benefits

        The Policy provides that an insured is entitled to long-term disability benefits for Total Disability when the facts establish that the claimant (1) "is not working or is earning less than 20% of his Indexed Total Monthly Earnings" and (2) "is unable to perform the Material and Substantial Duties of his Own Occupation."  (Id. at 12.)  To determine the Total Disability Benefit:

1.  Take the lesser of:
    a.  The Employee's Total Monthly Earnings multiplied by [66.67%]; or
    b.  The Maximum Monthly Benefit [$8,500]; then
2.  Subtract Other Income Benefits from the amount determined in Step 1.

(Id. (emphasis added).)

        "Total Monthly Earnings" refers to "the Employee's average monthly earnings from the W-2 form . . . received from the Employer for the prior calendar year immediately prior to the first date Total or Partial Disability begins . . . ."  (Id. at 10 (emphasis added).)  "Other Income Benefits," in turn, are benefits that are "provided or available to the Employee while a Long Term Disability Benefit is payable . . . as a result of the same Total or Partial Disability payable under [the] Policy."  (Id. at 14.)  The Policy explains that Other Income Benefits include, inter

alia, the amount the Employee is eligible for under workers' compensation law, a union benefit plan, social security benefits, and "any salary continuation paid to the Employee by his Employer . . . ." (Id. at 15 (emphasis added).) As the method of calculating the Total Benefits demonstrates, Other Income Benefits offset Sun Life's obligation to the insured. (Id. at 16.)

B.  Partial Disability Benefits

The Policy provides that an employee qualifies for a Partial Disability Benefit if: (1) "the Employee is working and has Disability Earnings of more than 20% but less than 80% of his Indexed Total Monthly Earnings"; and (2) "the Employee . . . is unable to perform the Material and Substantial Duties of his Own Occupation." (Id. at 13–14.) To determine the Partial Disability Benefit for the first twelve months of Partial Disability:

1.  [A]dd the Employee's Disability Earnings and income received from Other Income Benefits to the Total Disability Benefit.
2.  if this sum is in excess of 100% of the Employee's Indexed Total Monthly Earnings, subtract the amount in excess of 100% of the Employee's Indexed Total Monthly Earnings from the Total Disability Benefit.  This result is the Partial Disability benefit; or

if the sum is less than 100% of the Employee's Indexed Total Monthly Earnings, the Partial Disability Benefit is the Total Disability Benefit.

(Id. (emphases added).)

"Disability Earnings" are "the employment income an Employee receives while Partially Disabled or income an Employee receives while

4

participating in an approved Rehabilitation program." (Id. at 8.) Again, the method of calculating the Partial Disability Benefit demonstrates that Other Income Benefits are distinct from Disability Earnings and may offset Sun Life's obligation to the insured.

    C. Sun Life's Discretionary Authority

        Finally, the Policy explains that "[t]he Plan Administrator [Labatt] has delegated to Sun Life its entire discretionary authority to make all final determinations regarding claims for benefits under the benefit plan insured by this Policy," including "the determination of eligibility for benefits, based upon enrollment information provided by the Policyholder, and the amount of any benefits due, and to construe the terms of the Policy." (Id. at 32.) "Any court reviewing Sun Life's determinations," the Policy continues, "shall uphold such determination unless the claimant proves that Sun Life's determinations are arbitrary and capricious. (Id. at 32.)

II.   Plaintiff's Medical Conditions, Leave, Return to Work, and Retirement

    A. November 18, 2009 – May 2010

        From November 18, 2009, through December 24, 2009, Plaintiff underwent eleven vertebroplasties for compression fractures in his back. (Id. ¶ 6; CF at 223–55.) In January of 2010, Plaintiff was hospitalized for ten days after he developed complications—including acute renal failure, anemia, hypertension,

edema, low albumin, hypomagnesemia, and cement pulmonary embolism—from the vertebroplasties.  (Id. ¶ 7; CF at 160, 174, 177, 181, 213.)  Plaintiff was in an inpatient rehabilitation program from January 21, 2010, through February 5, 2010.  (CF at 51, 151, 155.)  During this time, Plaintiff's treating doctors reported that Plaintiff needed supervision or assistance with even the most basic activities of daily living, such as eating, grooming, bathing, dressing, using the toilet, and walking.  (Id. at 740–45.)  Plaintiff told his doctors, "I can't walk."  (Id. at 740–45.)  On February 22, 2010, another of Plaintiff's treating physicians reported that Plaintiff: (1) was not improving; (2) was still in a wheelchair; (3) was unable to get out of a chair; and (4) still required constant attention.  (Id. at 498.)  Plaintiff did not return to work until late May or early June of 2010.  (Id. at 470–71.)  Labatt paid Plaintiff his full salary during this period of leave, and Plaintiff did not apply for disability benefits from Sun Life.  (Pl.'s MSJ at 7; CF at 42–43, 1089, 1093.)

    B.  May 2010 – April 26, 2011

        It is not clear how many hours Plaintiff worked when he returned to Labatt, because Labatt did not keep track of that information.  (CF at 40.)  However, there is evidence that Plaintiff was only working half-days during this period and that his physical condition would not have permitted him to work more than that.  In discussions with Sun Life representatives, for example, Labatt

indicated that Plaintiff had returned to work in a reduced capacity in May of 2010 and that he had not worked full days.  (Id. at 39.)  Labatt explained that Plaintiff was permitted to have a flexible schedule as a courtesy due to Plaintiff's long tenure at the company.  (Id. at 39–40.)

　　　　Statements from Plaintiff's doctors also suggested that Plaintiff was not working full days.  On September 28, 2010, Plaintiff's treating physician, Dr. Seaworth, reported that Plaintiff had "returned to work for half days."  (CF at 265–66.)  On March 1, 2011, Dr. Molina reported that Plaintiff "ha[d] been working just half a day five days a week since May 2010" and that Plaintiff was "having a difficult time completing his days, even working a half a day . . . ."  (Id. at 470–71 (emphasis added).)  On April 13, 2011, Dr. Thorner reported that Plaintiff was "unable to walk stairs" or to "carry a briefcase or laptop"; that Plaintiff suffered "[b]ack discomfort if he walk[ed] for more than 20 to 30 feet"; and that Plaintiff had suffered from "[s]hortness of breath with minimal activity since the pulmonary emboli [in January 2010]."  (Id. at 365–66 (emphasis added).)  Dr. Thorner concluded: "I don't think [Plaintiff] is even capable of sitting at a chair and performing a job."  (CF at 365–66.)  Finally, on April 25, 2011, Dr. Willingham reported: "[Plaintiff] cannot continue to perform the work that he did before and even in his attempts of returning to work he has only been able to endure partial days."  (CF at 350–52.)

Plaintiff, however, insists that he was able to perform the Material and Substantial Duties of his Own Occupation during this time period and that he "worked essentially full-time" from May 2010 until late April of 2011.  (Doc. # 32 at 5; accord Pl.'s MSJ at 7.)  There is no dispute that Labatt continued to pay Plaintiff 100% of his salary and that Plaintiff did not apply for Partial or Total Disability Benefits from Sun Life during this period.  (Pl.'s MSJ at 7; CF at 42–43, 1089, 1093.)

C.  April 26, 2011 – Present

On or about April 26, 2011, Plaintiff "decided to follow the advice of his physicians and retire because his health had further deteriorated . . . ."  (FAC ¶ 10.)  In recognition of Plaintiff's long-time service to Labatt, however, the company continued to pay Plaintiff his full salary until June 17, 2011.  (Id. ¶ 11.)  From June 18 to August 12, 2011, Labatt paid Plaintiff a reduced salary (80% of his normal salary).  (Id. ¶ 11.)  Labatt stopped paying Plaintiff's salary continuance on August 13, 2011.  (Pl.'s MSJ at 7.)

II.  Plaintiff Applies for Benefits and Appeals Sun Life's Determination

On April 27, 2011, Plaintiff applied for long-term disability benefits from Sun Life.  (Id. ¶ 15; id. Ex. A.)  By letter dated June 9, 2011, Sun Life informed Plaintiff that it was reviewing his claim.  (Id. Ex. B.)

A.  Processing of Plaintiff's Claim

Sun Life's internal memos, contained in the Claim File, document its processing of Plaintiff's claim over the next few months.  On June 6, 2011, Jennifer Sagris, a Sun Life employee wrote: "VERIFY DOD [Date of Disability]. DATE NOT GIVEN ON EE [Employee] FORM."  (CF at 46.)  In other words, it was not clear precisely when Plaintiff's disability had begun.

The next entry, on June 9, 2011, indicated that Christopher Mitchell, who appears to have been the primary agent assigned to Plaintiff's claim, had spoken by phone with Plaintiff and Laurel Watts, a human resources representative from Labatt.  (Id. at 44.)[2]  Mitchell wrote that he had requested payroll documents from September 2009 through August of 2010 and from March of 2011 until the

_____

[2] Plaintiff objected to an exhibit within the Claim File that is also dated June 9, 2011.  (See doc. # 28.)  That document is entitled "Telephone Memo" (see id. Ex. 1; CF at 1083), and it purports to memorialize the June 9, 2011 conversation between Mitchell, Plaintiff, and Watts.  Plaintiff objects to the memo on the ground that it "reflects communication initiated by Defendant Sun Life's representative with Plaintiff Rudy Gallardo after Defendant Sun Life had received written notice of representation on May 2, 2011."  (Doc. # 28 at 2.)  Plaintiff attached a copy of the notice of representation and a copy of the receipt indicating that the notice was sent to Defendant by certified mail.  (See id. Ex. 2.)  Defendant has not addressed Plaintiff's objection to the Telephone Memo, and it appears that Mitchell did contact Plaintiff directly even after receiving written notice that he was represented by counsel.  Accordingly, the Court sustains Plaintiff's objection and will not consider any information in the Telephone Memo (or in the corresponding entry on Sun Life's internal docket sheet, see CF at 44) that was provided by Plaintiff in the absence of counsel.  The Court will consider the corresponding entry on Sun Life's internal document insofar as it reflects Mitchell's state of mind as opposed to information obtained from Plaintiff.

end of Plaintiff's employment.  (Id.)  At the end of the entry, under the heading "NEED TO DETERMINE," Mitchell wrote, inter alia, "DOD" (Date of Disability).  (Id. at 45.)  Under the heading "DIRECTION," Mitchell wrote "initial decision."  (Id.)  Mitchell also indicated that he needed to determine Plaintiff's "earnings prior to DOD."  (Id. at 44.)

On June 21, 2011, Mitchell's memo indicated that he had received payroll records from Labatt.  (Id.)  Under the heading "DOD," however, Mitchell indicated that "[b]ased on payroll records [it is] not clear if or when EE [employee] reduced hours.  EE continued to receive full salary."  (Id.)  Mitchell wrote that Plaintiff's medical records had been sent for review and that he had advised Plaintiff that "at this point [he] could not determine when [benefits] would begin to accrue due to [the] complex nature of [Plaintiff's] claim."  (Id.)  Under the heading "DIRECTION," Mitchell again wrote: "initial decision."  (Id.)

On July 15, 2011, Mitchell wrote that the medical review was complete and that it provided "support for lack of sustained sedentary."  (Id. at 43.)  In other words, Sun Life had determined that Plaintiff met the physical requirements for disability because he was not able to perform all the duties of a "sedentary physical exertion" job.  (Plaintiff's specific job was later determined to exceed this physical demand level.  (Id. at 1090–92.))

On August 3, 2011, however, Mitchell's entry indicates that Sun Life was still trying to determine Plaintiff's Date of Disability, because it was not clear if or when Plaintiff had reduced his hours—and, accordingly, if or when Plaintiff had met the requirement that he earn less than 80% or less than 20% of his pre-disability earnings (for Partial and Total Disability, respectively). Mitchell wrote that he had "[i]nquired about current amount EE is being paid" and that he had explained to Plaintiff that there was a 20% earnings loss requirement in the definition of Partial Disability. (Id.) Mitchell indicated that he "[a]dvised EE based on medical information claim is supported. Advised EE will f/u [follow up] with him after earnings info [received]." (Id.)

On August 4, 2011, Mitchell wrote that he had received updated salary information from Labatt and that it appeared Plaintiff had started working four-day weeks on June 6, 2011, and that his salary had been reduced to 80% at that time. (Id.) Since the definition of Partial Disability requires that the employee be earning less than 80% of his salary, however, Mitchell wrote under the heading "CLAIM DECISION" that the claim should be denied based on the fact that "[i]nsured is earning exactly 80%." (Id.) Mitchell wrote that he planned to "advise [Plaintiff] to submit new documentation of earnings when reduced." (Id.) Under the heading "NEXT STEPS," Mitchell indicated that he planned to "discuss [the] claim with [Plaintiff]." (Id.)

11

On August 8, 2011, Plaintiff called to inquire about the status of his claim. (Id. at 42.) An entry by Gretchen Hooper, another Sun Life employee, indicates that she informed Plaintiff that he did not meet the earnings requirement for Partial Disability since he was earning 80% of his salary. (Id.) Hooper wrote that Plaintiff "stated he [was] eligible for 100% of his benefits" and that a denial would be unacceptable. (Id.)

Later that day, Mitchell spoke with Plaintiff and with Laurel Watts, advising them that Plaintiff's claim was "supported from [a] medical standpoint" but that Plaintiff had "not reached [the] greater than 20% earnings loss threshold." (Id.) Mitchell advised Watts that Plaintiff would be eligible for benefits even if he was being paid "100% of salary [between regular] earnings and salary continuation as long as [he was] suffering 20% earnings loss from regular hours." (Id.) In other words, Mitchell was explaining that the amount Plaintiff received as salary continuation would not be considered part of his earned income and that as long as he was earning less than 80% of his pre-disability salary, he would be eligible for Partial Disability benefits. At that time, however (that is, in August of 2011), Mitchell appeared to be under the impression that Plaintiff was still working 80% of his hours and thus earning 80% of his pay, with just 20% coming from a salary continuation. Mitchell's notes indicate that he told Watts, who apparently wanted Plaintiff's benefits to start immediately, that he "could not guarantee [he] would be

12

able to start the EP [elimination period] at some point in the past but would review whatever info was submitted." (Id.) Watts indicated that she understood and said that she would look back through the records to "see if she [could] find anything about [Plaintiff] officially moving to part days." (Id.) Accordingly, under the heading "NEXT STEPS," Mitchell wrote: "– f/u [follow up] info from ER [employer] – final claim determination." (Id. (emphasis added).)

On August 11, 2011, Mitchell spoke with Watts again. (Id. at 41.) Mitchell advised her "to clearly document [the] date [Plaintiff] reduced his hours" because "that income [would] be transitioned to salary continuation." (Id. at 41.) Mitchell reiterated that it "appear[ed] based on this info" that the "original claim would be denied" because Plaintiff had not satisfied the earnings requirement. (Id.)

On August 16, 2011, Mitchell spoke with George Mauze, Plaintiff's attorney, and advised him of his preliminary determination that Plaintiff had not met the earnings requirement. (Id.) Mitchell wrote: "Advised of current situation with EE's claim and limited documentation in regards to hours EE actually worked and no reduction in salary." (Id.) Mitchell's notes indicate that Mr. Mauze, hoping that he could provide the required documentation of Plaintiff's reduced hours before the final claim decision was made, "advised he would f/u [follow up] with EE and ER and attempt to have info provided." (Id.)

13

On August 17, 2011, apparently in order to support Plaintiff's claim that he met the earnings requirement for Total Disability, Watts wrote a letter to Mitchell in which she stated, in part:

> In December 2009 [Plaintiff] developed several compression fractures in his back which necessitated several surgeries and then developed complications from the surgeries which extended his hospital stay and rehabilitation.  He was off work for several months.  He had numerous health problems in addition to his back injury which prevented him from fully performing the material and substantial duties of his position.  We moved his office to reduce stair climbing, <u>reduced his scope of work</u> and allowed him all the time off he needed for health care or illness.
>
> Although [Plaintiff] was unable to do material work after the time of his complete disability in April 2011, in recognition of his longevity Labatt elected to pay him a salary continuation on a gratuitous basis unrelated to his ability to work.

(Doc. # 31-4 at 13 (emphasis added).)

On August 19, 2011, Mitchell spoke with Watts and with Labatt's CEO, who informed him that Plaintiff had been doing "very little work" since April of 2011, that he was not given regular responsibilities, and that he was allowed to work as often as he wished, generally not even four hours per day.  (CF at 40.)  Mitchell indicated that he "would review [the] information submitted to determine [its] impact on [Plaintiff's] claim" and would contact Labatt the following week to discuss the decision.  (<u>Id.</u>)

On August 24, 2011, Mitchell wrote that he had discussed Plaintiff's claim with Watts and that pursuant to that discussion he had determined that

Plaintiff "was out of work late 11/09 or early 12/09 until approximately 5/2010." (Id. at 39.)  Plaintiff "then returned to work in a reduced capacity."  (Id.)  "Per discussions with [Labatt] and [Plaintiff]," Mitchell wrote, "the insured did not work full days, never more than 4 hours, usually on 1 or 2 days per week."  (Id.) However, Plaintiff "maintained full salary at all points up until 6/2011" when he was "reduced to exactly 80%."  (Id.)  Mitchell wrote that in his recent discussion with Watts and Labatt's CEO they had indicated that Plaintiff had not been working full-time for many months and that the "medical review and discussion with [the Registered Nurse] completing [the] review" supported the contention that Plaintiff "would not have been able to engage in full time sedentary [work] since his return to work in approx[imately] 5/2010."  (Id.)  "Based on all factors considered," stated Mitchell, Sun Life would "consider date of disability as when insured originally left work in 11/09 or 12/09."  (Id.)  Mitchell concluded: "Will treat period of time b/w 5/2010 and end of full pay as salary continuation as [Plaintiff] was working minimal hours during this time period."  (Id.)

On August 29, 2011, Mitchell again spoke with Watts and Labatt's CEO.  (Id.)  During that conversation, Mitchell requested documentation regarding Plaintiff's last day of work before his vertebroplasties in November of 2009.  (Id.) Mitchell's notes indicate that the CEO told him that "a disability date in 2009 would not be acceptable as this would result in [a] substantially lower benefit

amount." (Id.)  The CEO insisted that Plaintiff had "performed the majority of his job duties" after his return to work in May or June of 2010.  (Id.)  Mitchell wrote that he advised the CEO that Sun Life "had been told in the past the insured did not return to full time work in 2010" and that he "explained [the] partial disability provision in the policy."  (Id.)  The CEO stated that Labatt could not be expected to keep track of when employees were working back to 2009.  Mitchell responded that "at this point[,] based on all information that has been provided[,] it is not clear when the insured's disability began," and he advised the CEO that "partial disability [could] satisfy the requirements of the policy along with total disability." (Id.)  When the CEO inquired about "what type of information they could provide [Sun Life]," Mitchell responded that "anything that could document the time the insured was working" would suffice, including a calendar, time system, or even informal evidence, such as emails.  (Id.)  The CEO indicated that he "would look into what they could provide" and get back to Mitchell.  (Id.)

Two days later, the CEO wrote an email to Mitchell in which he stated:

> I had hoped that I might be able to create a detailed record of Rudy Gallardo's attendance from telephone data, but apparently we do not retain that data.  Therefore, I am not able to give you any greater detail.  However, I can repeat to you what I have said before—that Rudy returned to work from a prolonged illness in mid-2010, that except for illness he worked essentially full-time until April of this year, and that since April he has occasionally come to the office but has done no material work, so that we viewed the money we paid him after that as a gratuitous salary continuation.

16

I trust that Sun Life will recognize this as a legitimate claim for a disabled executive, even though he was not required to punch a time clock to account for his hours of attendance.

(Doc. # 31-4 at 14.)

On September 7, 2011, under the heading "CLAIM DECISION,"

Mitchell wrote:

Based on information submitted by ER [employer] it is unclear when the insured reduced his hours as a result of his medical condition.  Insured originally out of work 11/2009.  Per discussions with ER the insured returned to work at some point in 2010 but no records are available to document when insured returned.  Per discussions with ER and EE the insured was allowed to work reduced hours based on his medical condition upon his return to work in 2010 but no records to document hours insured actually worked.  Medical records document [dated] 9/28/2010 [states] the insured is working half days (pg 215 med recs, Heart and Vascular Institute of Texas).  ER has submitted letter dated 8/3/11 indicating the insured was moved from 5 days to 4 6/6/2011.  Prior conversations with ER 8/8/11 ER advised EE was moved to ½ days 4–5 months prior but no documentation was maintained and there was no reduction in pay.  Second letter received from ER dated 8/17/11, notes EE out of work since 12/2009 and was off work for several months.  Notes EE had multiple medical conditions that prevented insured from performing material duties of his occupation.  ER notes EE was allowed all the time off he wanted when he returned to work. ER notes EE suffered complete disability in 4/2011 but elected to continue paying salary continuation.  Letter dated 8/30/11 notes EE returned to work mid 2010 and performed essentially full time duties until April 2011 after which point the insured occasionally went to the office.

Based on all information submitted by the employer [it] is unclear when the insured returned to work after not working b/w 11/09 and some point in 2010.  It is unclear the amount of time the insured worked or what job duties were being performed.  Medical documentation from 9/2010 indicates the insured was working half days and conversations with ER and EE indicate the insured was allowed to take time off as needed after his return in 2010 and continued to be paid a full salary.  Based on all information date of

17

disability determined to be 11/18/09 based on insured undergoing surgery for vertebroplasty.  Insured continued to suffer complications into 2010.  All income after the insured returned to work will be treated as salary continuation as it is not clear what was regular pay and what was salary continuation pay.  The treatment of this income results in change in ben[efit] amount as he was receiving full pay during this time and is [therefore] entitled to the minimum benefit amount.

(Id. at 38.)  Mitchell's entry also indicates under the heading "MEDICAL": "See RN review, reasonable insured would have been unable to engage in full time sedentary since his surgery 11/2009.  Improvement not expected."  (Id.)

Later that day, Mitchell spoke with Plaintiff and informed him of the claim decision.  (Id. at 37.)  Mitchell told Plaintiff that "based on discussions with [Plaintiff] and [Labatt] and medical records" he had determined that Plaintiff was working part-time in 2010.  (Id.)  Mitchell's notes indicate that Plaintiff "advised this was true for all of 2010."  (Id.)

B.  Plaintiff's Claim Decision Letter

By letter dated September 7, 2011, Sun Life officially approved the payment of benefits to Plaintiff.  (Id. Ex. D.)  However, as described in the preceding section, Sun Life determined that Plaintiff's disability had begun on November 18, 2009—the date that Plaintiff first left work to undergo the eleven vertebroplasties.[3]  (Id. ¶ 29; id. Ex. D at 1.)  Sun Life applied a ninety-day elimination period as required by the terms of the Policy, and, accordingly,

---

[3] Due to a typographical error, the letter listed the disability date as November 18, 2011, instead of November 18, 2009.

determined that benefits began to accrue on February 16, 2010. (FAC ¶ 29.) Because Sun Life determined that Plaintiff had become Totally Disabled on November 18, 2009, not on or around April 27, 2011 (when he applied for benefits), it calculated his benefits using his 2008 earnings, which were substantially less than his 2010 earnings ($75,779.72/year or $6,314.98/month rather than $105,486.48/year or $8,790.54/month). (Id. Ex. D.) In addition, because Plaintiff had been receiving his full salary even when he was out on leave and even when he appeared to be working part-time, he was entitled only to the Minimum Monthly Benefit for those months.

     C.  <u>Plaintiff Appeals, and Sun Life Affirms Its Prior Determination</u>

        Disagreeing with Sun Life's determination regarding his disability claim, Plaintiff, by letter dated September 20, 2011, formally appealed the decision. (Id. Ex. E.) Plaintiff argued that he "was not 'disabled,' as defined in the policy, until April 26, 2011," because (1) he "continued to report to the office or work at home or make and receive phone calls wherever he was to fulfill his job duties," and (2) that definition requires that he earn less than 80% of his prior salary, whereas he continued to receive his full salary. (Id.)

        Sun Life, by letter dated December 21, 2011, upheld its prior determination that Plaintiff's date of disability was November 18, 2009. (Id. Ex. F.) The letter explained that Sun Life had determined: (1) that Plaintiff was

Totally Disabled from November 18, 2009, through May or June of 2010; (2) that
Plaintiff was Partially Disabled when he returned to work for Labatt from May or
June of 2010 through April of 2011; and (3) that Plaintiff was again Totally
Disabled beginning in April of 2011.  (Id. at 10.)  Sun Life explained that Plaintiff
met both the physical requirement (that the employee be "unable to perform the
Material and Substantial Duties of his Own Occupation") and the salary-based
requirement (for Partial Disability, that the employee earn "more than 20% but less
than 80% of his Indexed Total Monthly Earnings"; and for Total Disability, that he
earn "less than 20% of his Indexed Total Monthly Earnings") during those times.

Sun Life based its determination regarding the physical requirement
on medical records and discussions with Plaintiff and his employer, which
suggested that he had been working half-days and was not physically capable of
performing all of his job duties.  (Id. at 1–4, 6.)  While Plaintiff had been paid his
full salary during these periods, the letter explained, Plaintiff had not "earned" that
salary for purposes of his Indexed Total Monthly Earnings.  (Id. at 7.)  Instead, the
evidence showed that Plaintiff had been given a salary continuation "due to the
many years of service he provided for Labatt despite his inability to satisfy all of
the material and substantial duties of his own occupation." (Id.)  In other words,
Sun Life did not consider Plaintiff's salary continuation to be income "earned" and
instead categorized it as "Other Income Benefits" that offset Sun Life's obligation

to pay disability benefits.  (See id. at 8; Policy at 8, 12–14; Def.'s MSJ at 14–15

("[F]rom June 2010 through March 2011, Gallardo was Partially Disabled since

the records established he was only working ½ days, 5 days per week, which

means part of the income he received was Disability Earnings and the other part

was salary continuation.").)

   Accordingly, Sun Life concluded that "[b]ased on Mr. Gallardo's

salary continuation and Partial Disability Earnings, for the period of February 16,

2010[,] through August 12, 2011, he qualified for and should have been paid the

Minimum Monthly Benefit of $421.02 per month."  (Id. at 9.)  "For the period of

August 13, 2011"—the date that Labatt stopped paying Plaintiff a salary

continuance—"through December 31, 2011," the letter continued, Plaintiff

"qualified for and was paid $4,210.20 per month" (an amount equal to 66.67% of

his Total Monthly Earnings for 2008).  (Id.)

III. Plaintiff Files Suit Against Sun Life in Federal Court

   On February 2, 2012, Plaintiff filed suit against Sun Life under 29

U.S.C. § 1132(a) of the Employee Retirement Income Security Act ("ERISA").

(Doc. # 1.)  On June 21, 2012, Plaintiff filed an Amended Complaint (doc. # 17),

which alleged that Sun Life's determination that he was disabled on November 18,

2009, was arbitrary and capricious because "he (1) was working before, in

between, and after such medical procedures and hospitalization and earning 100%

21

of his salary; and (2) he was able to perform the material and substantial duties of

his own occupation."  (Id. ¶ 38.)  Plaintiff seeks (1) actual damages in an amount

equal to the additional benefits he would have received had Sun Life used April 26,

2011, rather than November 18, 2009, as his Date of Disability (by his calculation,

$146,233.40 rather than $64,750.00); (2) a judgment clarifying his rights to future

disability payments; and (3) interest, attorneys' fees, and costs.  (Id. ¶¶ 48–53.)

On November 19, 2012, the parties filed cross-Motions for Summary

Judgment.  (Docs. ## 30, 31.)  Those Motions are now before the Court.

<u>STANDARD OF REVIEW</u>

I.      <u>Summary Judgment</u>

A court may grant summary judgment under Federal Rule of Civil

Procedure 56 when "the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a); <u>see also</u> <u>Cannata v. Catholic Diocese of Austin</u>, 700 F.3d 169, 172

(5th Cir. 2012).  The main purpose of summary judgment is to dispose of factually

unsupported claims and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323–24

(1986).

The moving party bears the initial burden of demonstrating the

absence of any genuine issue of material fact.  <u>Id.</u> at 323.  If the moving party

meets this burden, the non-moving party must come forward with specific facts

that establish the existence of a genuine issue for trial. <u>ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.</u>, 699 F.3d 832, 839 (5th Cir. 2012).  In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." <u>Brown v. City of Hous.</u>, 337 F.3d 539, 541 (5th Cir. 2003).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

## II.   <u>Review of an ERISA Plan Administrator's Benefit Determination</u>

If an ERISA plan delegates discretionary authority to an administrator to determine eligibility for benefits or to interpret the terms of the plan, the plan administrator's benefit determination is reviewed for an abuse of discretion. <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); <u>Sweatman v. Commercial Union Ins. Co.</u>, 39 F.3d 594, 599 (5th Cir. 1994).  Where, as here, the plan administrator is also the plan provider, that conflict of interest must be weighed as a "factor in determining whether there is an abuse of discretion." <u>Met.</u>

Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008) (citing Firestone Tire, 489 U.S. at 115)).  The significance of the conflict of interest factor depends upon the circumstances of the particular case.  Id.

The Fifth Circuit has described a "two-step process to review a plan fiduciary's interpretation of its plan: First, a court must determine the legally correct interpretation of the plan.  If the administrator did not give the plan the legally correct interpretation, the court must then determine whether the administrator's decision was an abuse of discretion."  Ellis v. Liberty Life Assur. Co. of Boston, 394 F.3d 262, 269–70 (5th Cir. 2004).

"[F]actual determinations made by the administrator during the course of a benefits review will be rejected only upon the showing of an abuse of discretion."  Meditrust Fin. Servs. Corp. v. Sterling Chem., Inc., 168  F.3d 211, 213 (5th Cir. 1999).  A plan administrator abuses its discretion when its decision is not based on "substantial evidence" in the record.  Meditrust, 168 F.3d at 215; accord Holland v. Int'l Paper Co. Retirement Plan, 576 F.3d 240, 246 (5th Cir.2009) ("A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial.") (internal quotation marks and citations omitted).  "Substantial evidence" is more than a mere scintilla; "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Girling Health Care, Inc.

24

v. Shalala, 85 F.3d 211, 215 (5th Cir. 1996).  However, a court may not substitute its judgment for that of the plan administrator; "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary or capricious, it must prevail."  Ellis v. Liberty Life Assur. Co. of Boston, 394 F.3d 262, 273 (5th Cir. 2004).  The abuse-of-discretion standard exists to "ensure that administrative responsibility rests with those whose experience is daily and continual, not with the judges whose exposure is episodic and occasional."  Rigby v. Bayer Corp., 933 F. Supp. 628, 633 (E.D. Tex. 1996).

"A long line of Fifth Circuit cases stands for the proposition that, when assessing factual questions, the district court is constrained to the evidence before the plan administrator."  Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 299 (5th Cir. 1999) (emphasis added).  Accordingly, a court will grant summary judgment to a plan administrator where there was substantial evidence in the administrative record to support the benefit determination.  See Meditrust Fin. Servs. Corp. v. Sterling Chem. Inc., 168 F.3d 211, 213–16 (5th Cir. 1999) (affirming grant of summary judgment to administrator where decision was supported by substantial evidence); Mayeaux v. La. Health Serv. And Indem. Co., 376 F.3d 420, 430 (5th Cir. 2004) ("Mayeaux has failed to show abuse of discretion by the administrator of the Adler Plan, so the district court's grant of summary judgment on Mayeaux's denial-of-benefits claim was proper.");

McSperitt v. Hartford Life Ins. Co., 393 F. Supp. 2d 418, 428 (N.D. Tex. 2005)

("[T]he summary judgment record demonstrates that Hartford did not abuse its

discretion as claims administrator in denying such a claim.  Judgment will

therefore be entered in favor of Hartford.").

DISCUSSION

The parties agree that "there is no genuine issue for trial" and that

"Sun Life's determination is to be reviewed under an 'abuse of discretion'

standard."  (Pl.'s MSJ at 11–12; accord doc. # 33 (Def.'s Resp.) at 3.)  While

Plaintiff, in the Amended Complaint, initially argued that he was neither Partially

nor Totally Disabled at any point prior to April 2011, when he applied to Sun Life

for benefits, he now concedes that he was, indeed, Totally Disabled from late

November 2009 until he returned to work in May 2010.  (Pl.'s MSJ at 10.)  Now,

the crux of Plaintiff's argument is that "Defendant Sun Life's determination of

Partial Disability from May 2010 to April 2011 [is]: 1) contrary to the terms and

definitions of Partial Disability in the Policy; 2) contrary to the facts and

circumstances giving rise to Rudy Gallardo's claim for Total Disability benefits

under the Policy; and 3) [is] arbitrary and capricious."  (Id.)

Sun Life responds that the Court should grant summary judgment in

its favor because its determination that Plaintiff was Partially Disabled during that

period "was based on substantial evidence in the administrative record" and thus

"cannot be found to have been an abuse of discretion."  (Def.'s MSJ at 3–4.)  For the reasons that follow, the Court concludes that Sun Life's interpretation of the Policy was legally correct and that its determination that Plaintiff was Partially Disabled was supported by substantial evidence in the administrative record.

I.      Sun Life's Interpretation of the Policy

        Plaintiff argues that "Sun Life's interpretation [of the Policy] is legally incorrect" because Sun Life has concluded that "Partial Disability does not require the inability to perform the material and substantial duties of [the insured's] occupation <u>and</u> a loss of earnings . . . ."  (Pl.'s MSJ at 12.)  Plaintiff points to the relevant part of the Policy, which reads as follows:

> **Partial Disability or Partially Disabled** means the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation <u>and</u> the Employee has Disability Earnings of less than 80% of his Indexed Total Monthly Earnings.

(<u>Id.</u> at 13 (quoting Policy at 10) (emphasis added).)  Plaintiff appears to argue that Sun Life must have ignored the second prong of the test for Partial Disability—the Disability Earnings prong—because "the administrative record is wholly devoid of any facts that Rudy Gallardo was earning less than 100% of his salary at Labatt." (Pl.'s MSJ at 14.)  Because such an interpretation would contrary to the plain language of the Policy, insists Plaintiff, Sun Life's interpretation is legally incorrect.  (<u>Id.</u> at 13–15.)

The Court agrees that such an interpretation of the Policy would be contrary to its plain language and legally incorrect; however, the record does not support Plaintiff's contention that Sun Life disregarded the Disability Earnings prong.  Instead, Sun Life argues that Plaintiff satisfied that prong from May 2010 to April 2011 because he did not have "Disability Earnings" during that time that were equal to 80% or more of his Indexed Monthly Earnings.  (Def.'s MSJ at 19–20.)  Plaintiff "was not earning the 100% salary," insists Sun Life, because he was working only half-time, "and anything above what he might have earned would have been salary continuation[,] which is not included when determining if the individual meets the less than 80% earnings requirement for Partial Disability."  (Id. at 20.)

Accordingly, the initial question before the Court is whether Sun Life's interpretation of the term "Disability Earnings" is legally incorrect.

A. Sun Life Correctly Interprets "Disability Earnings" to Exclude "Other Income Benefits" Such As Salary Continuances

The Policy defines "Disability Earnings" as "the employment income an Employee receives while Partially Disabled or income an Employee receives while participating in an approved Rehabilitation program."  (Policy at 8.)  Sun Life insists that sums paid to an insured as part of a salary continuation do not constitute Disability Earnings but are instead Other Income Benefits that may

offset the Net Monthly Benefit that Sun Life is obligated to pay the insured.
(Def.'s MSJ at 19.)  "[S]alary continuation is a component of Other Income and
can only affect the <u>amount</u> of disability benefits an individual may receive under
the Policy," Sun Life explains.  (<u>Id.</u> at 20.)

   This interpretation is consistent with the terms of the Policy.  The
Policy states that "[a] Net Monthly Benefit will . . . include reductions described as
Other Income Benefits."  (Policy at 12.)  The Policy defines "Other Income
Benefits" as "those benefits provided or available to the Employee while a Long
Term Disability Benefit is payable" if "provided as a result of the same Total or
Partial Disability payable under this Policy."  (<u>Id.</u> at 14.)  The Policy states that
"Other Income Benefits include: . . . any salary continuation paid to the Employee
by his Employer" to the extent that the salary continuation "causes the Net
Monthly Benefit, plus Other Income Benefits . . . to exceed 100% of the
Employee's Total Monthly Earnings."  (<u>Id.</u> at 15.)

   The Court interprets these provisions to mean that any money
received as part of a salary continuation is not considered part of the insured's
Disability Earnings, which must be—as the name implies—"earned."  That this is
true is apparent from, <u>inter alia</u>, the method for calculating the Partial Disability
Benefit, which requires one to "add the Employee's Disability Earnings <u>and</u>
income received from Other Income Benefits to the Total Disability Benefit."

(Policy at 13–14 (emphasis added).)  If Other Income Benefits like salary continuations constituted "Disability Earnings," there would be no reason to "add" them to the insured's Disability Earnings when calculating the Partial Disability Benefit.  The clear language of the Policy explains that a salary continuation, if "provided as a result of the same Total or Partial Disability payable under [the] Policy," will be considered an "Other Income Benefit" that reduces the amount Sun Life is obligated to pay the insured to the extent that it "causes the Net Monthly Benefit . . . to exceed 100% of the Employee's Total Monthly Earnings." (Id. at 15.)

        This interpretation is consistent with other courts' interpretations of the term "salary continuation" in policies provided by Sun Life and by other insurers.  See, e.g., Bernardo v. American Airlines Inc., 297 F. App'x. 342, 344 n.2 (5th Cir. 2008) (noting, where the policy authorized twenty-four months of benefits, that insurer paid for just eighteen months' worth of benefits because employer had provided six months' salary continuation); Hannington v. Sun Life and Health Ins. Co., 711 F.3d 226, 228, 228 n.3 (1st Cir. 2013) ("[T]he Plan reduces [the insured's] benefit by amounts received as 'Other Income'[,] . . . [including] income received from any salary continuance plan."); Boyles v. Unum Life Ins. Co. of America, No. CV-05-6015 CASJWJX, 2006 WL 3405011, at *1 (C.D. Cal. Nov. 20, 2006) ("[T]he parties agree that plaintiff is not eligible for

short term disability for the first six weeks of disability because plaintiff

received salary continuation income directly from [her employer].  Thus, plaintiff

seeks only the remaining six weeks of short term disability benefits, i.e., that

portion of the twelve weeks not paid by [her employer], for a total value of $5,850,

exclusive of interest.").

    Even Plaintiff implicitly acknowledges that money received as part of

a salary continuation does not constitute Disability Income (i.e., does not constitute

income "earned") for purposes of the two-prong tests for Total and Partial

Disability, because Plaintiff no longer argues that he was incorrectly classified as

Totally Disabled from November 2009 to May 2010 even though during that time

he was paid 100% of his salary.  In other words, by conceding that he qualified as

Totally Disabled during that time, Plaintiff concedes that he was "earning less than

20% of his Indexed Total Monthly Earnings" even though he was being paid 100%

of his salary as a salary continuance.  Accordingly, Plaintiff necessarily concedes

that a salary continuation does not constitute wages "earned."

 B. Sun Life Did Not Abuse Its Discretion When It Determined That Plaintiff
   Was Partially Disabled From May 2010 to April 2011

    Having determined that Sun Life correctly interpreted the term

"Disability Earnings" not to include Other Income Benefits, the question then

becomes: Did Sun Life abuse its discretion when it determined that Plaintiff met

both prongs of the test for Partial Disability from May 2010 to April 2011?  In other words, did the administrative record support Sun Life's determination that Plaintiff, during the relevant time period, (1) was unable to perform the Material and Substantial Duties of his Own Occupation and (2) was earning less than 80% of his Indexed Total Monthly Earnings?  Again, the Court's review is deferential, asking whether the "administrator denied the claim without some concrete evidence in the administrative record."  Vega, 188 F.3d at 302.  For the reasons that follow, the Court concludes that there was substantial evidence in the administrative record to support Sun Life's determination of Partial Disability and that Sun Life did not, therefore, abuse its discretion.

    1.  <u>There Was Substantial Evidence That Plaintiff Was Unable to Perform the Material and Substantial Duties of His Own Occupation</u>

The Policy states that "Material and Substantial Duties"

> means, but is not limited to, the essential tasks, functions, skills or responsibilities required by employers for the performance of the Employee's Own Occupation.  Material and Substantial Duties does not include any tasks, functions, skills or responsibilities that could be reasonably modified or omitted from the Employee's Own Occupation.

(Policy at 9.)

     "Own Occupation" means

> the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national

32

economy immediately prior to the first date Total or Partial Disability began. Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location.

(Id. at 10.)

The occupation of Purchasing Manager is categorized as a "sedentary physical exertion" job in the national economy. (CF at 1090–92.) However, Plaintiff's specific job exceeded this physical demand level. (Id.) His duties included overseeing purchases of products for distribution, determining inventory levels by item, ensuring accurate product costs, developing relationships with product manufacturers, negotiating pricing, managing purchasing staff, and traveling "regularly" to visit manufacturers and for trade shows and industry conferences. (Id. at 64.)

As described above, there was evidence in the administrative record that Plaintiff, from May 2010 to April 2011, was unable to perform all the Material and Substantial Duties of his occupation. On July 15, 2011, Betty Todd, a Medical Consultant, performed a Medical Review of Plaintiff's records and concluded that Plaintiff would have had difficulty engaging even in light or sedentary activities from May 2010 to July 2011. (Id. at 1086–88.)

Additionally, statements from Plaintiff's own doctors confirmed that he had not been able to work full-time since returning to work in May of 2010 and had been struggling to work even half-days. On March 1, 2011, Dr. Molina

reported that Plaintiff "ha[d] been working just half a day five days a week <u>since</u>
<u>May 2010</u>" and that Plaintiff was "<u>having a difficult time completing his days,</u>
<u>even working a half a day . . . .</u>" (<u>Id.</u> at 470–71 (emphases added).)  On April 13,
2011, Dr. Thorner reported that Plaintiff was "unable to walk stairs" or to "carry a
briefcase or laptop" and that Plaintiff suffered "[b]ack discomfort if he walk[ed]
for more than 20 to 30 feet." (<u>Id.</u> at 365–66.)  Dr. Thorner also stated that Plaintiff
had suffered from "[s]hortness of breath with minimal activity <u>since the pulmonary</u>
<u>emboli</u>," which Plaintiff had suffered in January 2010.  (<u>Id.</u> at 365–66 (emphasis
added).)  At that time, Dr. Thorner concluded: "I don't think [Plaintiff] is even
capable of sitting at a chair and performing a job." (<u>Id.</u> at 365–66.)  Finally, on
April 25, 2011, Dr. Willingham—who was writing at Plaintiff's request in support
of Plaintiff's Total Disability claim—reported: "[Plaintiff] cannot continue to
perform the work that he did before and <u>even in his attempts of returning to work</u>
<u>he has only been able to endure partial days</u>." (<u>Id.</u> at 350–52 (emphasis added).)
Especially considering that Plaintiff's duties had included "regularly" traveling
around the U.S. to visit manufacturers and to attend trade shows and industry
conferences (CF at 364), these doctors' statements support the conclusion that
Plaintiff was not able to perform all of his duties during this time.

      Even Plaintiff's own statements contradict the contention that he did
not qualify as Partially or Totally Disabled from May 2010 to April 2011.  When

Plaintiff first filed a claim for benefits with Sun Life, he listed "November 2010"—months before the date he now contends he first became disabled, April 2011—as the "Date first unable to work."  (Id. at 353.)

Accordingly, there was sufficient evidence in the record to support Sun Life's determination that Plaintiff, upon returning to work in May of 2010, was not capable of fully performing the Material and Substantial Duties of his Own Occupation.

2.  There Was Substantial Evidence That Plaintiff Was "Earning"
Less than 80% of His Indexed Total Monthly Earnings

For the reasons given above, Sun Life correctly interpreted the term "Disability Earnings" to exclude Other Income Benefits such as salary continuations.  Accordingly, the next question is whether Sun Life abused its discretion when it determined that Plaintiff satisfied the second prong of the test for Partial Disability because he was "earning" less than 80% of his Indexed Total Monthly Earnings.  The Court concludes that Sun Life did not abuse its discretion.

Plaintiff insists that Sun Life could not reasonably have concluded that he was working half-time from May 2010 onward in light of the letter written by Labatt's CEO in which the latter claimed that Plaintiff worked "essentially full-time" during that period.  (Doc. # 32 at 4.)  However, Sun Life points out that this letter (and another from Laurel Watts) "were created by Gallardo's employer

35

in August 2011, after concern was raised that Gallardo's claim might be denied, and apparently in an effort to assist Gallardo in obtaining disability benefits." (Doc. # 33 at 8.)  Sun Life points out that these are the only two documents in the administrative record upon which Plaintiff relies in support of his argument that he could perform the Material and Substantial Duties of his job from May 2010 to April 2011.  (Id.)

In light of the fact that so much other evidence contradicted the claim that Plaintiff was working "essentially full-time" from May 2010 to April 2011—from the doctors' reports to Plaintiff's own admission on his claim form that he was unable to work as of November of 2010—the Court cannot conclude that it was an abuse of discretion to discount the claims the CEO made in his letter. Especially considering that neither Plaintiff nor Labatt was able to produce any records to demonstrate that Plaintiff worked more than half-time during this period, the Court cannot conclude that Sun Life abused its discretion when it determined that Plaintiff was "was not earning the 100% salary, and anything above what he might have earned would have been salary continuation[,] which is not included when determining if the individual meets the less than 80% earnings requirement for Partial Disability."  (Def.'s MSJ at 20.)

Plaintiff points out that Mitchell, on August 4, 2011, stated in an internal memo that Plaintiff's claim "[would] be denied based on not Totally or

Partially disabled . . . ."  (Doc. # 32 at 3 (quoting CF at 43).)  Mitchell wrote this,

notes Plaintiff, "<u>after</u> Defendant Sun Life had received all of the physicians' letters

and medical records upon which Defendant Sun Life relies in its Motion for

Summary Judgment to prove that Rudy Gallardo was Partially Disabled."

(Doc. # 32 at 3.)  This reversal, Plaintiff argues, demonstrates that Sun Life's final

determination was a result of the inherent conflict of interest resulting from it being

both the plan administrator and the plan provider.  (<u>Id.</u> at 4.)

    The Court is conscious of the risk of a conflict of interest stemming

from Sun Life's role as both administrator and provider.  <u>See</u> <u>Met. Life Ins. Co.</u>,

554 U.S. at 108.  However, the Court does not find Mitchell's change of course to

be evidence of a conflict of interest or of bad faith.  Instead, taken in the context of

the other internal memos that Mitchell wrote during his investigation (detailed in

Part I.A., <u>supra</u>), it seems clear that this statement was part of an initial claim

decision that was made before Mitchell or anyone else at Sun Life had suspected

that Plaintiff might have been working just half-days since May of 2010.

Mitchell's notes indicate that Plaintiff's Date of Disability was in question from

the beginning and that he initially looked to payroll records from Labatt to

determine whether Plaintiff had met the earnings requirement.  Once he obtained

the payroll records, Mitchell wrote that it was "not clear if or when EE reduced

hours" because Plaintiff had "continued to receive full salary."  (CF at 44.)  On that

same day, he wrote that Plaintiff's medical records had been sent to someone else for review.  (Id.)

On July 15th, Mitchell wrote that the medical review had been completed and that it provided "support for lack of sustained sedentary."  (Id.)  In other words, the third-party reviewer had determined that Plaintiff met the physical requirements for disability.  On August 3, however, Mitchell was still "inquir[ing] about [the] current amount EE is being paid," and his memo for that day indicates that he told Plaintiff he would follow up with him "after earnings info rcvd [received]."  (Id. at 43.)  On the following day, August 4, Mitchell wrote that he had received updated salary information from Labatt and that it appeared Plaintiff had started working four-day weeks on June 6, 2011, and that his salary had been reduced to 80% at that time.  (Id.)   It was on this day that Mitchell wrote that the claim should be denied, since, according to Labatt, Plaintiff was "earning exactly 80%."  (Id. (emphasis added).)

These notes indicate that Mitchell relied on a third party to read through the more than 1000 pages of medical records in the Claim File and determine whether Plaintiff qualified for disability from a medical standpoint and that Mitchell was relying on Labatt to provide records documenting the hours that Plaintiff worked and the salary he earned.  It seems likely, therefore, that Mitchell himself did not look at the medical records—and thus did not see the doctors'

38

statements that Plaintiff was working just half-days—until Plaintiff and Labatt

gave him reason to suspect that Plaintiff's 80% "earnings" were not earnings but a

salary continuation.  Indeed, Mitchell's notes from August 8—notably, <u>after</u> the

preliminary determination about which Plaintiff complains and almost a month

<u>before</u> Sun Life sent Plaintiff an official claim decision letter—make clear that

Plaintiff and Labatt, worried that Plaintiff's claim would be denied, were trying to

convince Mitchell that Plaintiff <u>did</u> meet the earnings requirement because he had

moved to half-days at some point in the past.  (<u>Id.</u>)  Mitchell advised Motts "to

clearly document [the] date [Plaintiff] reduced his hours" because "that income

would be transitioned to salary continuation."  (<u>Id.</u>)  That Mitchell had not yet

come to final claim decision and was still trying to determine whether and when

Plaintiff had moved to half-days is clear from what he wrote under the heading

"NEXT STEPS": "– f/u [follow up] info from ER [employer]   – <u>final</u> claim

decision."  (<u>Id.</u> (emphasis added).)

        Mitchell's notes document that over the next few weeks he discussed

Plaintiff's work schedule with Labatt and determined that Plaintiff "returned to

work in a reduced capacity" in May of 2010.  (<u>Id.</u> at 39.)  Mitchell also noted that a

discussion with the Registered Nurse who performed Plaintiff's medical review

supported the contention that Plaintiff "would not have been able to engage in full

time sedentary [work] since his return to work in approx[imately] 5/2010."  (<u>Id.</u>)

Then, in early September, Mitchell wrote for the first time that Plaintiff's medical records indicated that he had been working half-days in 2010.  (Id.)  Together, these notes suggest that Mitchell simply had not been aware that Plaintiff's doctors had said anything about his work schedule (as opposed to his physical condition) in the medical records.  In other words, it is not unlikely that Mitchell trusted the third-party reviewer to determine that Plaintiff qualified for disability from a medical standpoint and did not look at those records himself until he realized that Labatt's employment records were inadequate and that there was a substantial question regarding whether Plaintiff was really "earning" the 80% salary he was being paid at the time he filed a claim.  Once Mitchell saw that Plaintiff's doctors had stated that he had been working just half-time since May of 2010, Mitchell acknowledged those statements in his notes and came to a different conclusion regarding the earnings requirement.  Because there is a logical, good-faith explanation for Mitchell's change of course regarding the earnings requirement, the Court rejects Plaintiff's contention that that change of course is evidence of Sun Life's conflict of interest or bad faith.

As described extensively above, there is substantial evidence in the record to support Sun Life's determination that Plaintiff was working just half-time following his return to work in May of 2010.  Again, Labatt acknowledged that Plaintiff worked on a flexible schedule when he returned to work in May of 2010,

and Plaintiff's doctors repeatedly stated that he had been working half-days since that time.  Plaintiff himself had listed "November 2010" as the date on which he was first unable to work, and Plaintiff had told Mitchell that he had been working only part-time throughout all of 2010.  (CF at 37.)  If Plaintiff was only working half-time during this period, logically he could not have been "earning" 100% of his full-time pre-disability salary.[4]  Accordingly, Sun Life did not abuse its discretion when it determined that Plaintiff was earning less than 80% of his pre-disability salary and that the remainder of the money Labatt paid him during this time was a salary continuation.

\*     \*     \*

Because there was substantial evidence in the administrative record to support Sun Life's determination that Plaintiff was unable to perform the Material and Substantial Duties of his Own Occupation and was not "earning" 80% of his

---

[4]   As an aside, the Court notes that if Sun Life had <u>not</u> determined that Plaintiff qualified as Partially Disabled from May 2010 to April 2011, there would have been substantial evidence in the record to support a determination that Plaintiff was not eligible for <u>any</u> benefits after May 2010.  This is so because, as Sun Life points out, "to maintain coverage, Gallardo would be required to meet the definition of 'Actively at Work'—which requires a showing that Gallardo be <u>able to perform *all* regular duties of his job for a *full* work day</u>."  (Doc. # 33 (citing Policy at 6).)  In other words, because there was substantial evidence in the record to support the determination that Plaintiff was not working full days after May 2010, there would have been sufficient evidence in the record to support the determination that Plaintiff was ineligible for <u>any</u> long-term disability benefits after that time, since the Policy covers only employees who qualify as "Actively at Work."  (<u>See</u> Policy at 25.)

pre-disability salary from May 2010 to April 2011, Sun Life did not abuse its

discretion when it determined that Plaintiff was Partially Disabled during that time.

See Holland, 576 F.3d at 246 (noting that an administrator does not abuse its

discretion if its decision is based on evidence that clearly supports the basis for its

denial, "even if [that evidence is] disputable").  Accordingly, Sun Life is entitled to

summary judgment.  See Meditrust, 168 F.3d at 213–16 (affirming grant of

summary judgment to administrator where decision was supported by substantial

evidence).

<u>CONCLUSION</u>

For the foregoing reasons, the Court hereby **GRANTS** Defendant

Sun Life's Motion for Summary Judgment (doc. # 30) and **DENIES** Plaintiff Rudy

Gallardo's Motion for Summary Judgment (doc. # 31).

**IT IS SO ORDERED.**

**DATED:**  San Antonio, Texas, June 10, 2013.

_____
David Alan Ezra
Senior United States District Judge

42